IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 20, 2011 Session

## VELDA J. SHORE v. MAPLE LANE FARMS, LLC, ET AL.

**Appeal from the Chancery Court for Blount County**
**No. 08021 Telford E. Forgety, Jr., Chancellor**

_____

**No. E2011-00158-COA-R3-CV-FILED-APRIL 11, 2012**
_____

The plaintiff homeowner appeals from the trial court's dismissal of her complaint, in which
the court found the defendants' farm activities were protected from the application of the
local zoning laws by the Tennessee Right-to-Farm Act, Tennessee Code Annotated section
43-26-101, et seq.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P.
FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Michael H. Meares, Maryville, Tennessee, for the appellant, Velda J. Shore.

John T. Johnson, Jr., Knoxville, Tennessee, for the appellees, Maple Lane Farms, LLC,[1]
Robert A. Schmidt d/b/a Maple Lane Farms, and Al Schmidt d/b/a Maple Lane Farms.

### OPINION

### I. BACKGROUND

In 1975, the property originally known as Maple Lane Farms was subdivided into a

---

[1]Maple Lane Farms, LLC was dismissed as a party by order entered on April 21, 2008, as it has been
administratively dissolved as a Tennessee Limited Liability Company.

number of different parcels.[2]  During the early 1980s, Albert Schmidt  ("Father") and his wife, Shirley Schmidt ("Mother"), along with their son, Robert Schmidt ("Son") (collectively, "the Schmidts"), acquired eleven different adjoining parcels with eight different deeds and reconstituted their area of the subdivision back into a farm.[3]  The Schmidts' farm, known as "Maple Lane Farms," has been doing business in its current form since 1985.[4]  Among other things, the Schmidts, using their parcels collectively, operate a pumpkin patch and corn maze in the fall.  Tax returns of Son reveal that he describes himself as a beef cattle farmer; the record, however, indicates that much of his income comes primarily from the corn maze and "Strawberry Jam" concert ticket sales.

The property occupied by the farm is surrounded by four subdivisions.  The plaintiff, Velda J. Shore, purchased a lot in one of the neighboring subdivisions in 2003, approximately 18 years after the current farm operation came into existence.  Ms. Shore contends that after she moved in, the Schmidts began to expand their pumpkin patch and corn maze to include other entertainment, such as hayrides.  She testified that from 2006 to 2008, the activities on the farm, such as amplified musical performances, helicopter rides, and ATV use, resulted in more and more noise, disturbing her quiet enjoyment of her property.  According to Ms. Shore, 75 percent of Maple Lane Farms' income comes from purely commercial entertainment enterprises -- not farming. She contends, therefore, that the property is not entitled to any exemption from zoning regulations as a result of claims of being a farm.

---

[2]Subdivision was known as "Maple Lane Farms."  The 1975 plat is of record.

[3]One deed, for example, contained the following description:

BEING a part of Lot No. 31 of the MAPLE LANE FARMS as shown by map of said subdivision of record in the Register's Office for Blount County, Tennessee, in Map File 579B (formerly Map Book 11, Page 50) and more particularly described as follows:

BEGINNING at an iron pin, corner to Wrother in Maple Lane Subdivision, said iron pin being located N. 37 deg. 00 min. E. 416.9 feet from an iron pin in the right of way line of Maple Lane Road and corner to Lot 12 of Maple Lane Subdivision; thence with line of Wrother, S. 41 deg. 00 min. E. 822.10 feet corner with Lot 32 of said subdivision; thence N. 52 deg. 16 min. 20 sec. E. 984.70 feet to a point in the line of Neely; thence with Neely, N. 41 deg. 22 min. W. 910.00 feet to a point in line of Neely and corner to Lot 30 of said subdivision; thence with Lot 30, S. 50 deg. 10 min. W. 981.09 feet to a point in line of Lot 30; thence S. 42 deg. containing 20.069 acres, more or less, according to survey of Gerald F. Clark, Surveyor, dated March 26, 1975, of Maple Lane Farm Subdivision.

[4]The business is owned 100 percent by Son, who is the only person listed on the business license. Father helps with the operation at the direction and control of Son.

In an effort to address what she considered to be a nuisance, Ms. Shore inquired of Blount County authorities regarding whether the Schmidts were properly authorized to engage in the activities they were conducting at the farm. On November 1, 2007, the Blount County Building Commissioner ("the Commissioner") wrote a letter to Son relating in pertinent part:

> You have recently been operating helicopter rides and concerts that are in conflict with Blount Count[y's] Zoning Regulations. The locations of these uses are on the properties identified on tax map 88, parcels 24, 24.13, and 24.24.
>
> It is well known that you have been operating a corn maze for some time now and that use falls under exemptions for agricultural uses found in section 2.1 of the Zoning Regulations for Blount County. The zoning regulations define[] agricultural use as follows: This includes all forms of agriculture, growing of crops, dairying, the raising and maintaining of poultry and other livestock, horticulture, forestry, fish hatcheries and ponds, dog kennels and other small animal specialty farms, provided all health codes of Blount County and the State of Tennessee are complied with.
>
> Based on this information helicopter rides and concerts do not fall under the exemption for agricultural use, nor are they permissible uses in the Rural District 1 Zone. The helicopter rides and concerts must *cease* within the next thirty (30) days. . . .

Son filed a timely appeal and on December 13, 2007, the Commissioner revisited the determination. Ms. Shore subsequently was informed that Blount County considered music festivals to be legal temporary uses on the property. Son agreed to cease offering helicopter rides.

Upon an appeal by Ms. Shore, Blount County's Board of Zoning Appeals ("the Board") issued a decision on January 3, 2008, holding that the Schmidts would be allowed one concert per year on the property. The Board found, however, that concerts do not support the agricultural use. Son was present when the Board's decision was issued and was informed of his right to appeal. He also received notice of the Board's ruling by letter from the Commissioner:

> This letter is to confirm the decision of the Blount County Board of Zoning Appeals regarding concerts held at Maple Lane Farms. At the meeting of the [Board] held on January 3, 2008, it was decided that only one concert would

be allowed per year.

While Son acknowledges knowing the Board limited him to one music concert event per year, he ignored the Board's ruling and continued to have multiple concerts in 2008 and 2009. Upon the Board learning that Son was violating its ruling, it directed the Commissioner to write Son again regarding the violation. According to Son, he disregarded the Board's ruling because he had "discovered that agriculture is exempt from all zoning regulations."

In the meantime, Ms. Shore filed this action seeking a declaratory judgment,[5] injunctive relief,[6] and to abate a nuisance. A hearing was conducted on July 6, 2010.

Neighbor James Hartman, who lives across the parking area for Maple Lane Farms, testified at the hearing that the farm's activities interfered with his family's quiet enjoyment of their home. In particular, he complained of being unable to get his small children to bed. Mr. Hartman noted that his family leaves their home when the music concerts are occurring because "you can't -- even with the house shut up, you can't hear the TV or talk on the telephone . . . ." He indicated that the activities at the farm have adversely affected his ability to sell his home. Mr. Hartman specifically testified as follows:

Q. Okay. So September and October. Could you tell the Court specifically what happened that was a concern with either traffic, trash, or noise?

A. Oh, certainly. The traffic level increased in front of our home by a factor of five hundred. The speeding increased in front of the home, the people doing burnouts coming out of the parking lot. And understand that if these people lose control of their vehicle, it's coming down into my front yard into my home.

The trash we picked up there, you know, it just became a morning thing to go out and pick the trash out of the front yard. It's not like somebody dumped their garbage bag. It's a bottle or two bottles or a wrapper or, you know, just whatever they chucked as they were coming out the door.

The lights, same issue. When the business operation extends after dark, the

---

[5]On May 5, 2010, the trial court entered an order of voluntary dismissal of the request for declaratory relief.

[6]An order denying the temporary injunction relief was entered on May 21, 2008.

Schmidts are obligated to provide lighting for the parking lot for the safety of their patrons. Unfortunately, again, that light lights up the front of our home. Does that -- does that answer your question adequately?

Neighbor Eddie Johnson[7] testified that one could feel vibrations from the intensity of the noise and that it got so loud one could not sleep or hear the TV inside even if one moved to the basement. He indicated that he put in new insulated windows in 2009 to lessen the noise. Additionally, like Mr. Hartman, Mr. Johnson stated that he and his wife leave their home when noise is occurring. Mr. Johnson specifically described hearing the noise from different bands, hundreds of people walking around talking and screaming, traffic and cars peeling out, a chainsaw at night for a haunted maze, four wheelers, and low flying helicopters. He related that the Schmidts bring in tractor-trailers of pumpkins for the pumpkin patch because they no longer grow their own melons anymore.

Neighbor Lark Hayden testified that she likes the Schmidts' corn maze but described the loud noise as being bothersome. According to Ms. Hayden, the noise interfered with her sleep and reading. She related further as follows:

Q. How has the noise bothered you? What is it about the noise that has bothered you?

A. Well, the music was just very, very, very loud, you know, like I could almost feel the vibrations in my chest, you know, the whole house, and you couldn't get away from it.

* * *

A. Yes, I could feel a thumping, thump, thump, thump, like it was thumping in my chest. It was extremely loud.

Ms. Hayden noted that she wrote an anonymous letter complaining about the noise to the Schmidts.

At the time of the hearing, Ms. Shore testified she was 82 years old. She noted that unlike her neighbors, she is unable to escape the vibrating noise that aggravates her irregular heart beat because she is going blind with glaucoma and cannot drive at night. Ms. Shore

---

[7]Mr. Johnson testified about the construction of his home in the subdivision known as "Maple Lane Farm" *prior* to the entity now known as Maple Lane Farms existing.

opined that her health has declined as a result of the Schmidts' activities.[8]

At the close of Ms. Shore's proof, the Schmidts moved for dismissal, raising the issue of Wife being a necessary party. The trial court granted the motion, dismissing Ms. Shore's cause of action for failure to name an indispensable party.

Ms. Shore subsequently filed a motion for new trial pursuant to Rule 59.02 of the Tennessee Rules of Civil Procedure, asserting that Rule 19.01, Tennessee Rules of Civil Procedure provides: "If the person has not been so joined, the court shall order that the person be made a party." She further argued that Rule 21, Tennessee Rules of Civil Procedure provides:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

Accordingly, Ms. Shore argued that the dismissal based upon the failure to join an indispensable party was improper. *See McNabb v. Highways, Inc.*, 98 S.W.3d 649, 656 (Tenn. 2002).

A hearing was held on December 7, 2010, upon Ms. Shore's motion for a new trial and the Schmidts' response to that motion. The trial court ordered that its previous order be altered and amended by striking as the sole reason for dismissal the failure to join an indispensable party. The court then ruled that Ms. Shore's lawsuit was dismissed in accordance with the court's findings of fact and conclusions of law, as outlined below:

## FINDINGS OF FACT

1. The Order of this Court, dated July 20, 2010, that dismissed the Plaintiff's claim never became a final order.

---

[8]Ms. Shore further asserts that the Schmidts have terrorized her for complaining about their activities. Father admits to writing a letter to the editor of the local paper referring to Ms. Shore as being a part of a "coalition of greed, jealousy and mental instability." He also acknowledges that some of the signs harassing Ms. Shore were made on the farm. The record reveals that one event involving Son laughing at Ms. Shore while she pulled up a sign critical of her resulted in her suffering an asthma attack that required emergency room treatment.

2. The entire case is still within the jurisdiction of this Court, and subject to further consideration by the Court of all evidence that has been presented and all applicable law.

3. The evidence presented at the trial of this matter was clear that Maple Lane Farms is an active farm operation within the meaning of a farm as described in the Right to Farm Act located at T.C.A. 43-26-103.

4. The definition of agriculture is located within the Tennessee Code at T.C.A. 1-3-105 and T.C.A. 43-1-113. These statutory definitions of agriculture include recreational and educational activities on land used in the commercial production of farm products and nursery stock.

5. This Court does not find credible Plaintiff's expert testimony at trial concerning whether or not the activities at Maple Lane Farms were generally accepted agricultural practices and could be considered recreation within the meaning of T.C.A. 1-3-105 and T.C.A. 43-1-113.

6. The declaratory judgment portion of this lawsuit was previously voluntarily dismissed without prejudice by the Plaintiff.

7. The Blount County Zoning Resolution specifically does not apply to agriculture and agricultural uses of property.

8. The Plaintiff did not allege or request any monetary relief in her pleadings.


## CONCLUSIONS OF LAW

1. Due to the fact that the Order dated July 20, 2010, has not become final, this Court has the authority, on its own motion and at the request of the Defendants, to amend it.

2. On the day of the trial on the merits, the Plaintiff did not prove her case by a preponderance of the evidence to establish that the Defendants were guilty of a common law nuisance.

3. This Court could have ruled upon the merits of Defendants' arguments to dismiss at the close of the Plaintiff's proof at trial.

4. The Right to Farm Act, located at T.C.A. 43-26-103, creates a rebuttable presumption that a farming operation is not a nuisance. The Plaintiff did not overcome this presumption.

5. The activities alleged by the Plaintiff, such as music concerts and corn mazes, that took place at Maple Lane Farms, do fit within the statutory definition of agriculture located at T.C.A. 1-3-105 and T.C.A. 43-1-112.

6. The alleged recreational activities that have occurred at Maple Lane Farms were part of its farming operation.

7. The Plaintiff did not prove any monetary damages at the trial. Plaintiff also did not prove by a preponderance of the evidence that her health had been adversely affected.

8. Plaintiff cannot base her claims upon a ruling of the Board of Zoning Appeals, due to the fact that the Blount County Zoning Resolution does not apply to Maple Lane Farms.

9. To the extent Plaintiff bases her claim upon an alleged violation of a zoning ordinance, Plaintiff's claim must fail, because the Blount County Zoning Resolution does not apply to the agricultural and recreational activities that have occurred at Maple Lane Farms.

The trial court also found it appropriate to overrule the motion for new trial as a matter of docket control/case flow management. The court noted as follows:

The instant case has had multiple trial date settings, with the Court reluctantly allowing it to be continued from those settings. To allow a new trial in this case would have the effect of placing it back on the Court's docket simply because it was not ready to be tried to conclusion on the date the trial was set, and conducted. Moreover, if the case were restored to the docket, it would then have priority at the next docket call (by reason of its older filing date) over all the cases which have been filed since -- some of which have not been able to get even one trial date, let alone multiple dates. For these reasons, it is also appropriate that the Motion for New Trial be overruled, and the case be dismissed.

Ms. Shore timely filed a notice of appeal.

## II. ISSUES

On appeal, Ms. Shore raises the following issues:

1. Whether the trial court erred in dismissing Ms. Shore's case without making specific findings of fact?

2. Whether the trial court erred in holding the Blount County Board of Zoning Appeals' Ruling invalid?

3. Whether the trial court erred in holding music concerts are a part of agriculture and a farming operation?

4. Whether the court erred in denying the availability of relief upon proof of nuisance by repeated violations of the zoning ordinance and special damage to Ms. Shore?

As stated by Tennessee Farm Bureau Federation ("Farm Bureau") in its amicus curiae brief, the issue before this court is as follows:

Whether the trial court erred in granting the Schmidts' motion to dismiss based upon (a) Ms. Shore's failure to overcome the presumption that a farming operation is not a nuisance under the Tennessee Right-to-Farm Act; (b) the trial court's holding that the activities at Maple Lane Farms fit within the statutory definition of agriculture; and (c) the trial court's holding that the Blount County zoning regulations do not apply to Maple Lane Farms or to the agricultural, education and recreational activities at Maple Lane Farms.

## III. STANDARD OF REVIEW

This case was tried by the trial court without a jury; the case was dismissed at the end of Ms. Shore's proof. The scope of review on appeal is governed by the provisions of Tennessee Rules of Appellate Procedure 13(d). We review the record on appeal de novo with a presumption that the trial court's findings are correct unless the preponderance of the evidence is otherwise. *Boote v. Shivers*, 198 S.W.3d 732, 740 (Tenn. Ct. App. 2005). We must give great weight to the trial court's assessment of the evidence, as it is in a better position to evaluate witness credibility. *Id.* The trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

# IV. DISCUSSION

## ZONING REGULATIONS

We will initially address the zoning issues raised by Ms. Shore.

While counties lack inherent power to control the use of private property within their boundaries, they have been delegated certain express authority to enact zoning ordinances and general police power regulations by the state legislature. *421 Corp. v. Metro Gov. of Nashville*, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000). Pursuant to a county's delegated zoning authority,

> *[t]he county legislative body of any county is empowered*, in accordance with the conditions and the procedure specified in this part, *to regulate*, in the portions of such county, which lie outside of municipal corporations, the location, height and size of buildings and other structures, the percentage of lot which may be occupied, the sizes of yards, courts, and other open spaces, the density and distribution of population, the uses of buildings and structures for trade, industry, residence, recreation or other purposes, and *the uses of land for* trade, industry, residence, *recreation, agriculture*, forestry, soil conservation, water supply conservation or other purposes.

Tenn. Code Ann. § 13-7-101(a)(1) (emphasis added) (2011). Additionally, Tennessee Code Annotated section 5-1-118(c) (2011) states that "any county may . . . exercise those powers granted to all or certain municipalities by § 6-2-201(22) and (23)," thereby effectively granting counties the authority to:

> (22) Define, prohibit, abate, suppress, prevent and regulate all acts, practices, conduct, businesses, occupations, callings, trades, uses of property and all other things whatsoever detrimental, or liable to be detrimental, to the health, morals, comfort, safety, convenience or welfare of the inhabitants of the municipality, and exercise general police powers;

> (23) Prescribe limits within which business occupations and practices liable to be nuisances or detrimental to the health, morals, security or general welfare of the people may lawfully be established, conducted or maintained.

Tenn. Code Ann. § 6-2-201(22) and (23) (2011).

The Tennessee Supreme Court has noted that the county legislative bodies are granted

"broad powers to enact and amend zoning regulations governing the use of land." *Fallin v. Knox County*, 656 S.W.2d 338, 342 (Tenn. 1983). However, while local governments are granted "considerable discretion" in the exercise of their delegated regulatory authority, local government zoning and police power regulations may not conflict with state laws. *421 Corp.*, 36 S.W.2d at 475.

According to the Zoning Resolution of Blount County ("Zoning Resolution"), the property known as Maple Lane Farms is located in an R-1 zone. The intent of the R-1 zone designation is "to regulate rural development of expected moderate to low density within the county." Pursuant to the Zoning Resolution, the permitted uses in an R-1 district are

> one or two single family dwellings or manufactured home dwellings on a single lot, duplex dwellings, customary home occupations, group homes as provided in Tennessee Code Annotated, section 13-24-101, *et seq*; churches, temples and other places of worship, cemeteries associated with churches and other places of worship; local, state and federal government and utility uses necessary for providing services to land or population within the district; and accessory structures customarily associated with the above uses.

In the R-1 zone, "all uses are prohibited except those uses permitted specifically or by special exception by the Board of Zoning Appeals . . . ." The provisions of the Zoning Resolution became effective on September 1, 2000. By that time, the property at issue had been operating as a farm -- a non-conforming use -- for 15 years. To address such a situation, section 5.1 of the Zoning Resolution provides:

> **Continuation of Non-Conforming Uses and Structures**. All uses and structures in existence at the effective date of this Resolution, which are not in conformity with regulations and provisions contained in this Resolution shall be allowed to continue in operation and/or existence as prior to effective date of this Resolution.

Thus, although the property apparently ceased being a farm at one point and was subdivided, it was partially recombined into a farm and was operating as a farm -- an agricultural use – on the effective date of the Zoning Resolution.

Tennessee Code Annotated section 13-7-114 provides in pertinent part:

This part shall not be construed as authorizing the requirement of building permits nor providing for any regulation of the erection, construction, or reconstruction of any building or other structure on lands now devoted to

agricultural uses or which may hereafter be used for agricultural purposes, except on agricultural lands adjacent or in proximity to state federal-aid highways, public airports or public parks; provided, that such building or structure is incidental to the agricultural enterprise. Nor shall this chapter be construed as limiting or affecting in any way or controlling the agricultural uses of the land.

Likewise, a county's delegated authority to exercise general police powers does not extend "the power to prohibit or regulate normal agricultural activities." Tenn. Code Ann. § 5-1-122. Accordingly, section 2.1 in the Zoning Resolution for the county states that "agricultural uses and structures shall not be subject to the regulations and provisions of this Resolution as provided in Tennessee Code Annotated, Section 13-7-114."

Neither the zoning nor general police power agricultural exemption provisions define what constitutes agricultural use or purpose. The Zoning Resolution for the county does not define "agricultural uses and structures," but in article 13 defines agriculture as "[t]his includes all forms of agriculture . . . provided all health codes of Blount County and the State of Tennessee are complied with."

In its findings of fact, the trial court found that the Zoning Resolution specifically did not apply to agriculture and agricultural uses of property based on the plain language of the resolution and related statutes. The court concluded as a matter of law that the Zoning Resolution did not apply to the activities at Maple Lane Farms. Upon our review of the record, the preponderance of the evidence supports the conclusion of the trial court that the Schmidts were engaging in sufficient agricultural activities to merit exemption from the Blount County zoning provisions.


## TENNESSEE RIGHT-TO-FARM ACT

The Tennessee Right-To-Farm Act ("Act"), Tennessee Code Annotated section 43-26-101, et seq., provides that farms or farm operations are presumed to be neither public nor private nuisances.[9] The Act specifically provides:

---

[9]Under Tennessee law, a nuisance is anything that "annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable. A nuisance extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of the property." *Jenkins v. CSX Transp., Inc.*, 906 S.W.2d 460 (Tenn. Ct. App. 1995); *Oakley v. Simmons*, 799 S.W.2d 669, 671 (Tenn. Ct. App. 1990).

(a) It is a rebuttable presumption that a farm or farm operation, except a new type of farming operation as described in subsection (b), is not a public or private nuisance. The presumption created by this subsection (a) may be overcome only if the person claiming a public or private nuisance establishes by preponderance of the evidence that either:

(1) The farm operation, based on expert testimony, does not conform to generally accepted agricultural practices; or

(2) The farm or farm operation alleged to cause the nuisance does not comply with any applicable statute or regulation, including without limitation statutes and regulations administered by the department of agriculture or the department of environment and conservation.

(b) With regard to the initiation of a new type of farming operation, there is a rebuttable presumption that the new type of farm operation is not a public or private nuisance, if the new type of farming operation exists for one (1) year or more on the land that is the subject of an action for nuisance before the action is initiated. The presumption created by this subsection (b) may be overcome only if the person claiming a public or private nuisance establishes by a preponderance of the evidence that either:

(1) The new type of farm operation, based on expert testimony, does not conform to generally accepted agricultural practices; or

(2) The new type of farm operation alleged to cause the nuisance does not comply with any applicable statute or regulation, including without limitation statutes and regulations administered by the department of agriculture or the department of environment and conservation.

(c) As used in this section, "new type of farming operation" means a farm operation that is materially different in character and nature from previous farming operations and that is initiated subsequent to the date that the person alleging nuisance became the owner or lessee of the land, the use or enjoyment of which is alleged to be affected by the farming operation; "new type of farming operation" does not include the expansion or addition of facilities for a type of farming operation that existed on the land that is the subject of an action for nuisance prior to the date that the person alleging nuisance became the owner or lessee of the land, the use or enjoyment of which is alleged to be affected by the farming operation.

(d) Nothing in this section shall be construed as limiting the ability of the trier of fact to determine whether a particular farming activity is either a new type of farming operation as defined in this section, or is an expansion of or addition to an existing type of farming operation.

Tenn. Code Ann. § 43-26-103 (2007).[10]  Within the Act, a "farm operation" means

a condition or activity that occurs on a farm in connection with the commercial production of farm products or nursery stock as defined in § 70-8-303, and includes, but is not limited to: marketed produce at roadside stands or farm markets; noise; odors; dust; fumes; operation of machinery and irrigation pumps; ground and aerial seeding and spraying; the application of chemical fertilizers, conditioners, insecticides, pesticides, and herbicides; and the employment and use of labor[.]

"Generally accepted agricultural practices" is not defined in the statute and was not discussed in the legislative history.[11]  "Agriculture" is statutorily defined elsewhere in the Tennessee Code as

(i) The land, buildings and machinery used in commercial production of farm products and nursery stock;

(ii) The activity carried on in connection with the commercial production of farm products and nursery stock; and

(iii) *Recreational and educational activities on land used for the commercial production of farm products and nursery stock.*

Tenn. Code Ann. §§ 1-3-105(2)(A)(i-iii) (Supp. 2011) and 43-1-113 (b)(1)(A-C) (2007)

----

[10]Tennessee actually has two right-to-farm laws.  Tennessee Code Annotated sections 44-18-101 to 104 applies to feedlots, dairy farms, and egg production houses.

[11]Senator Burks, the sponsored of the Act in the Senate in 1982, related that its purpose was to enable farms that had been in families for generations to make changes in order to survive economically.  In the House version of the Act, its sponsor, Representative Byrd, stated that developers were buying up huge parcels of land next to farmers and then harassing them about nuisances until they were forced out of business.  It was stressed that the Act was to protects the farm "if it is there first."  Representative Cobb observed that section (a) of the Act said nothing about being in existence beforehand, with such language being found only in section (b).

(emphasis added).

Ms. Shore attempted to overcome the presumption that Maple Lane Farms was entitled to protection under the Act with the expert testimony of Dr. Frank Leuthold, a former professor at the University of Tennessee College of Agriculture and a former Knox County, Tennessee, County Commissioner. Mr. Leuthold opined that music concerts could not be considered generally accepted agricultural practice. He expressed the following views regarding the statute:

Q. And what do you understand that law was intended to protect in terms of the activities on farms?

A. Knowing that on a farm, and knowing that I removed a lot of manure, spread a lot of manure and so forth, and I know how manure smells and other things: I know how chemicals when you put them on the fields smell. There are odors. There is loud machinery at times. There are smells and so forth that occur on a farm that some people would say those bother me. And those that live – don't live on farms would say that is a nuisance. And the right to farm says if you're using those things in generally acceptable agricultural practices, spreading manure, putting on fertilizer, putting on fungicides and so forth that you're allowed to do that. And you're protected from nuisances and so forth. But it says that the caveat of this is as long as they're being used in generally acceptable agricultural practices. . . .

Q. And, in your opinion, the music concerts fall out of that range?

A. I think they fall outside that range because it has nothing to do with acceptable practice that produces anything for cattle, for strawberries, for pumpkins, for corn or anything else. So it has nothing to do with the production of that.

In its amicus brief, Farm Bureau asserts to the contrary that listening to musical performances could easily be considered a recreational activity pursuant to Tennessee Code Annotated sections 1-3-105(2)(A)(i-iii) and 43-1-113(b)(1)(C). We note at the outset of our review that we have located no published case law in this state interpreting Tennessee's Right-to-Farm Act.

# RIGHT-TO-FARM ACTS GENERALLY

To preserve farmlands, right-to-farm laws[12] have been enacted in all fifty states.[13] "Right to farm statutes were created to address a growing concern that too much farmland was being overtaken by urban sprawl."[14]  Margaret Rosso Grossman & Thomas G. Fischer, *Protecting the Right to Farm: Statutory Limits on Nuisance Actions Against the Farmer*, Wis. L. Rev. 95, 97 (1983).  While nuances exist from one act to another, right-to-farm laws are

_____

[12]In addition to Tennessee, some of the other states with right-to-farm laws are: Alabama, Ala. Code § 6-5-127; Alaska, Alaska Stat. § 09.45.235; Arizona, Ariz. Rev. Stat. Ann. §§ 3-1051 to -1061; Arkansas, Ark. Stat. Ann. §§ 34-120 to -126; California, Cal. Civ. Code § 3482.5; Colorado, Colo. Rev. Stat. §§ 35-3.5-101, et seq.; Connecticut, Conn. Gen. Stat. Ann. § 19a-341; Delaware, Del. Code Ann. tit. 3, § 1401; Florida, Fla. Stat. Ann. § 823.14; Georgia, Ga. Code Ann. § 41-1-7; Hawaii, Haw. Rev. Stat. §§ 165-1 to -4; Idaho, Idaho Code §§ 22-4501 to -4504; Illinois, Ill. Rev. Stat. ch. 5, para. 1101 to 1105; Indiana, Ind. Code Ann. § 34-1-52-4; Iowa, Iowa Code Ann. §§ 172D.1 to 172D.4; Kansas, Kan. Stat. Ann. §§ 47-1501 to -1510; Kentucky, Ky. Rev. Stat. Ann. § 413.072; Louisiana, La. Rev. Stat. Ann. §§ 3.3601, et seq.; Maine, Me. Rev. Stat. Ann. tit. 17, § 2805; Maryland, Md. Cts. & Jud. Proc. Code Ann. § 5-308; Massachusetts, Mass. Gen. Laws Ann. ch. 111, § 125A; Michigan, Mich. Comp. Laws Ann. §§ 286.471 to 286.474; Minnesota, Minn. Stat. Ann. § 561.19; Mississippi, Miss. Code Ann. § 95-3-29; Missouri, Mo. Ann. Stat. § 537.295; Montana, Mont. Rev. Code Ann. §§ 27-30-101(3), 45-8-111(4); Nebraska, Neb. Rev. Stat § 81-1506; New Hampshire, N.H. Rev. Stat. Ann. § 430-C; New Jersey, N.J. Stat. Ann. §§ 4:1C-1, et seq.; New Mexico, N.M. Stat. Ann. Laws § 47-9-3; New York, N.Y. Pub. Health Law, § 1300-C; North Carolina, N.C. Gen. Stat. § 106-701; North Dakota, N.D. Cent. Code §§ 42-04-01 to -05; Ohio, Ohio Rev. Code Ann. §§ 929.01 to 929.05; Oklahoma, Okla. Stat. Ann. tit. 50, § 11-16; Oregon, Ore. Rev. Stat. § 30-935; Pennsylvania, 3 Pa. Stat. Ann. §§ 951, et seq,; Rhode Island, R.I. Gen. Laws §§ 2-23-1 to -7; South Carolina, S.C. Code Ann. §§ 46-45-10, et seq.; South Dakota, S.D. Codified Laws Ann. § 21-10-25; Texas, Tex. Agric. Code Ann. §§ 251.001, et seq.; Vermont, Vt. Stat. Ann. tit. 12, §§ 5751 to 5753; Virginia, Va. Code Ann. §§ 3.1-22.28 to -22.29; Washington, Wash. Rev. Code Ann. §§ 7.48.300 to -310; West Virginia, W.Va. Code §§ 8-24-73 to -78; Wisconsin, Wisc. Stat. Ann. §§ 814.09, 823.08(3); and Wyoming, Wyo. Stat. §§ 11-39-101 to -104.

[13]*See* Neil Hamilton & David Bolte, *Nuisance Law and Livestock Production in the United States: A Fifty-State Analysis,* 10 J. Agric. Tax'n & L. 99 (1988).  Right-to-Farm acts were adopted during a time when public concern about the loss of productive farmland in this country to non-agricultural uses was high on the national policy agenda.  *See, e.g.*, W. Wendell Fletcher & Charles E. Little, *The American Cropland Crisis: Why U.S. Farmland is Being Lost and How Citizens and Governments are Trying to Save What is Left* (1982); R. Neil Sampson, *Farmland or Wasteland: A Time to Choose* (1981).

[14]Initially, right-to-farm laws were intended to protect pre-existing agricultural operations - traditional family farms, where a small amount of waste was generated and all or most of it was recycled onto the land and where the farm did much of its business, both buying and selling, locally.  *Ask Dr. Dave: Explaining Politics and Policies*, http://static.newrules.org/drdave/3-rttofarm.html, at 1-2.  A central feature of the traditional legislation was that the change in circumstances must have occurred outside the farm, not in the farm's operations.  Thus, "if a housing development was established near a farm, the farm was protected. If on the other hand, the farm itself dramatically changed its size or operations, right-to-farm protection in the form of immunity from nuisance suits may be lost."  *Id.* at 2-3.

essentially a codification of the common law defense of "coming to the nuisance." Neil D. Hamilton, *Right-to-Farm Laws Reconsidered: Ten Reasons Why Legislative Efforts to Resolve Agricultural Nuisances May Be Ineffective*, 3 Drake J. Agric. L. 103, 104 (1998); Grossman & Fischer, at 118; Randall Wayne Hanna, *"Right to Farm" Statutes -- The Newest Tool in Agricultural Land Preservation*, 10 Fla. St. U. L. Rev. 415, 430 (1982). The right-to-farm laws function to protect farmland from conversion to other uses by reducing the likelihood of a nuisance suit that would force the owner to sell the land for non-farm use. Nuisance complaints objecting to noises, odors, dust, chemical use, and slow-moving machinery, with their associated legal costs, combined with other factors, make farming more difficult and less lucrative. Alexander A. Reinert, Note, *The Right to Farm: Hog-Tied and Nuisance-Bound*, 73 N.Y.U.L. Rev. 1694, 1697 (1998). "Most such laws specifically assert that, if an agricultural operation was not a nuisance prior to changed conditions (e.g., non-farm residential development) in the surrounding area, then it cannot become a public or private nuisance because of changing conditions." Patricia Norris, Gary Taylor, and Mark Wyckoff, *When Urban Agriculture Meets Michigan's Right to Farm Act: The Pig's in the Parlor*, 2011 Mich. St. L. Rev. 365, at 373 (2011). The laws alert and place on notice those non-farm owners who move into agricultural areas that use of their property may be subject to the rights of the nearby pre-existing farm operations.[15] Hamilton (1998) at 104; *See* Jacqueline P. Hand, *Right-to-Farm Laws: Breaking New Ground in the Preservation of Farmland*, 45 U. Pitt. L. Rev. 289, 292 (1984). As author Hamilton above notes:

> Preventing non-farm operations from moving close to and then challenging the very existence of an indigenous agricultural operation can be a valid attempt to preserve farms and farmland and a way of insuring fundamental fairness. At the same time, it is necessary to acknowledge that to be effective right-to-farm laws require a reallocation of property rights (or at least of societal priorities). For the laws to work, some conduct that previously would have been actionable as a nuisance is now protected solely due to the legislative protection. As such, the laws naturally give rise to concerns on the part of individual property owners whose legal right to enjoy their property free from nuisance is now limited and by the courts that must implement and enforce the reallocation of social protections.

---

[15]An example of why right-to-farm acts were enacted is revealed in *Pendoley v. Ferreira*, 187 N.E.2d 142 (Mass. 1963). The Ferreiras began the operation of a hog farm in 1949 in what was then a "rural community." *Id.* at 144. In later years, the area grew, with more than 30 new homes being built near the farm. Although the hog farm was one of the best operated in the state, the court granted the new neighbors an injunction, and provided the Ferreiras a "reasonable time" to find new premises. *Id.* The court took into account that the Ferreiras were in place first, but emphasized that "the injury to the farmers was 'only economic' while the material interference with the rights of the plaintiffs [was] in the day to day use and comfort of the places where they live." *Id.* at 146.

Hamilton (1998) at 105.

Hamilton posits that "[t]he right-to-farm concept retains its strongest equitable justification when connected with a requirement that the farming operations being protected were in existence prior to changes in the surrounding area that are now giving rise to the alleged nuisance." Hamilton (1998) at 108; *See, e.g., Buchanan v. Simplot Feeders Ltd. Partnership*, No. 65298-8, 1998 Wash. LEXIS 201 (Wash. Mar. 19, 1998). It serves to establish the premise that people who moved into the adjacent area knew that farming operations were in existence. Hamilton (1998) at 108. In a later work, however, he indicated that a number of states have taken the original idea of right-to-farm laws and have broadened or strengthened the protection available. Hamilton (1998) at 106.

## AGRITOURISM

We are faced with a factual scenario requiring the broadening of the original idea of the Tennessee Right-to-Farm Act. Based on our review of the legislative history of the Act, we do not believe the Tennessee General Assembly back in 1982 ever conceived that this statute would be used in conjunction with a nuisance complaint regarding outdoor musical concerts. In enacting the Act, the legislature intended to protect farming operations from nuisance lawsuits involving typical farm matters such as odors and dust arising from the increasing urbanization of traditionally agricultural areas.

That being said, we recognize that agriculture is changing and evolving. The Schmidts assert that the activities on their farm constitute "agritourism," as defined in Tennessee Code Annotated section 43-39-101:

> (1) "Agritourism activity" means any activity carried out on a farm or ranch, eligible for greenbelt classification under Title 67, Chapter 5, Part 10, that allows members of the general public, for recreational, entertainment, or educational purposes, to view or enjoy rural activities, including farming, ranching, historic, cultural, or harvest-your-own activities, or natural activities and attractions. An activity is an agritourism activity whether or not a participant provides compensation in money or other valuable compensation to participate in the activity. . . .

Tenn. Code Ann. § 43-39-101(1) (Supp. 2011).

The amicus brief of the Farm Bureau describes "agritourism" as activities where the public is brought to the farm to learn about and purchase its products. These activities are

-18-

viewed as a marketing and promotion effort to further the income of the farming operation and to put the farm in the minds of the public as a place to buy such products. Mike Alfred, a Certified Public Accountant who testified on behalf of Ms. Shore, observed that the State Department of Revenue in the publication, *Sales and Use Tax Application to Farming, Timber Harvesting, Nursery Operations, and Agritourism* (Feb. 2009) defines agritourism as

> a style of activity in which hospitality is offered on farms. This may include the opportunity to assist with farming tasks during visits. Participants can pick fruits and vegetables, visit mazes cut in crop fields or "Halloween" mazes, ride horses, taste honey, learn about crops, participate in hayrides (which may include picnics, campfires, bonfires, and entertainment, music, dancing), shop in gift shops and farm stands for local and regional produce or hand-crafted gifts, purchase food and beverages, purchase photographs, and much more.

The Tennessee Department of Agriculture and other state agencies have announced initiatives over the last decade aimed at increasing farm income, rural economic activity, and exposure to Tennessee's agricultural-based attractions. M. Bruch and R. Holland, *A Snapshot of Tennessee Agritourism: Results from the 2003 Enterprise Inventory* (The University of Tennessee Center for Profitable Agriculture, October 2004); Center for Profitable Agriculture, *Tennessee Agri-tourism Initiative: Turning Small Farms into Big Opportunities- SDA Rural Development and TDA Market Development* (2003)[Online].

Our research revealed an Oregon tax case addressing agritourism. In *Lakeview Farms v. Washington Cty Assessor*, No. TC-MD 100443D, 2011 WL 4852468 (Or. Tax Ct. Oct. 13, 2011), the tax assessor asserted that the property at issue was used for commercial purposes, rather than farming. The plaintiff contended that his pumpkin patch operation was an agricultural activity constituting "agri-tourism" and presented evidence that the State of Oregon acknowledges and supports "agri-tourism." *Id.* at *10. The court recognized "agritourism" as "a commercial enterprise at a working farm . . . conducted for the enjoyment of visitors that generates supplemental income for the owner," but determined that in the absence of legislative amendments, the Oregon Supreme Court had "declined to allow an exemption for activities not traditionally included in the definitions of "farm" or "agriculture" or explicitly stated in the applicable statute." *Id.* at *2, 6. The *Lakeview Farms* court recognized that the courts of Oregon "ha[d] declined to extend the concept of "agriculture" beyond that traditional definition in the absence of clear legislative intent." 2011 WL 4852468, at *10.

We are not faced with the obstacle that confronted the Oregon appellate court. The activities at the farm meet the definition of agritourism found in Tennessee Code Annotated

section 43-39-101.  State materials on the topic specifically address corn mazes, pumpkin patches, and on-the-farm festivals.  Our legislature clearly considers agritourism to be the equivalent of agriculture, i.e., "[r]ecreational and educational activities on land used for the commercial production of farm products . . . ." Tenn. Code Ann. §§ 1-3-105(2)(A)(i-iii) and 43-1-113(b)(1)(A-C).  Thus, "agritourism" would constitute a "farm operation . . . [that] conform[s] to generally accepted agricultural practices" pursuant to the Act.  Tenn. Code Ann. §§ 43-26-103 (a)(1) and (b)(1).

Even if one argues that the Schmidts have materially expanded their activities since Ms. Shore became a resident in the nearby subdivision and the larger and louder activities would equate to "the initiation of a new type of farming operation" under subsection (b) of Tennessee Code Annotated section 43-26-103, meaning "a farm operation that is materially different in character and nature from previous farming operations and that is initiated subsequent to the date that the person alleging nuisance became the owner or lessee of the land, the use or enjoyment of which is alleged to be affected by the farming operation," Tenn. Code Ann. § 43-26-103(b) and (c), the record before us reveals that Ms. Shore is unable to overcome the presumption that the activities do conform to generally accepted agricultural practices.

The evidence supports the determination of the trial court that Ms. Shore failed to rebut the presumption that the activities at Maple Lane Farms are not a nuisance pursuant to the Tennessee Right-to-Farm Act.  As this finding is dispositive of this matter, we pretermit consideration of any other issues raised.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case remanded.  Costs of the appeal are taxed to the appellant, Velda J. Shore.

_____
JOHN W. McCLARTY, JUDGE

-20-